*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JUSTIN TYLER BEMBENECK,

Defendant-Appellant.

UNPUBLISHED
January 20, 2022

No. 352561
Leelanau Circuit Court
LC No. 19-001997-FC

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BAILEY KATHLEEN ROSINSKI,

Defendant-Appellant.

No. 352919
Leelanau Circuit Court
LC No. 19-001998-FC

Before: CAMERON, P.J., and SHAPIRO and REDFORD, JJ.

PER CURIAM.

In these consolidated appeals, defendants Justin Tyler Bembeneck (Bembeneck) and Bailey Kathleen Rosinski (Rosinski) appeal their jury-trial convictions. In Docket No. 352561, Bembeneck appeals his convictions of assault with intent to do great bodily harm (AWIGBH), MCL 750.84(1)(a), armed robbery, MCL 750.529, assault with intent to rob while armed, MCL 750.89, two counts of felonious assault, MCL 750.82, and larceny in a building, MCL 750.360. The trial court sentenced Bembeneck to 20 to 40 years' imprisonment for the AWIGBH conviction, to 30 to 60 years' imprisonment for the armed robbery conviction, to 30 to 60 years' imprisonment for the assault with intent to rob while armed conviction, to two to four years' imprisonment for each felonious assault conviction, and to two to four years' imprisonment for the larceny in a building conviction. We affirm.

-1-

In Docket No. 352919, Rosinski appeals her convictions of AWIGBH, armed robbery, assault with intent to rob while armed, and felonious assault. The trial court sentenced Rosinski to 6 to 10 years' imprisonment for the AWIGBH conviction, to 22 to 50 years' imprisonment for the armed robbery conviction, to 18 to 50 years' imprisonment for the assault with intent to rob while armed conviction, and to two to four years' imprisonment for the felonious assault conviction. We affirm.

## I. BACKGROUND

Defendants convictions arise from the armed robbery of Rosinski's grandmother, the stabbings of Rosinski's grandfather and Richard Rosinski (Richard), and the assault of Brian Rosinski (Brian). Richard and Brian are Rosinski's uncles, and they lived with Rosinski's grandparents, Francis Rosinski (Francis) and Helen Rosinski (Helen), at all relevant times. Before the crimes were committed on January 10, 2019, Rosinski resided in her grandparents' home for two weeks. During that time, her grandparents loaned her a significant amount of money. They asked Rosinski to leave the home in the fall of 2018, and she moved in with Bembeneck.

On January 9, 2019, Bembeneck, who was on dual supervision for parole and probation, reported for a drug screening and attempted to submit a "fraudulent urine sample." He fled when he was caught. On the morning of January 10, 2019, Rosinski cut off Bembeneck's tether and disposed of it. A warrant was issued for Bembeneck's arrest, and defendants decided to leave the state.

On the evening of January 10, 2019, defendants arrived at the home of Rosinski's grandparents in a vehicle that belonged to Bembeneck's mother. Bembeneck had never met Rosinski's family, and defendants entered the home without knocking. After they were greeted by Helen, defendants grabbed her by the arms and "marched" her to the bedroom that she shared with Francis. Rosinski demanded money and went to the bedroom closet, which contained an unlocked safe and a metal strongbox. Bembeneck pushed Helen to the floor and assisted Rosinski with removing items from the closet. After defendants left the bedroom, Helen locked the bedroom door and contacted law enforcement. Bembeneck exited the home through a sliding glass door, which led to a deck. Rosinski repeatedly and aggressively demanded money from Francis, who was in the living room.

Brian came upstairs from the basement. Upon hearing Rosinski's demands, Brian suggested that Rosinski obtain employment, and an argument ensued. Rosinski took a long "kitchen knife" from her purse and raised the knife "like she was going to stab" Brian.[1] Brian stated that he was going to call 911 and took out his cell phone. Seconds later, Bembeneck reentered the home and hit Brian on the head with a flashlight. In the meantime, Francis approached Rosinski from behind, grabbed both of her arms, and "Brought [her arms] down alongside of her." Francis then moved Rosinski toward the front door in an effort to "boot her out[.]" Bembeneck hit Francis on the head with the flashlight, and Francis "released" Rosinski. Rosinski then "turned towards [Francis] with [the] knife," and she stabbed Francis twice in the leg. Bembeneck picked up Brian's cell phone, which was on the floor, and left the home. As Rosinski

---

[1] Rosinski testified at her trial that she had obtained the knife from her grandparents' kitchen.

-2-

was preparing to leave, Richard came upstairs from the basement. Rosinski stabbed him in the chest and neck and left the home.

Law enforcement arrived after defendants fled the scene. Francis, Brian, and Richard were transported to the hospital. After a lengthy police chase, defendants were apprehended and arrested. Items belonging to Francis and Helen were found inside the vehicle, including a checkbook, coins, certain documents, and the strongbox. A flashlight and Brian's cell phone were also found in the vehicle.

Bembeneck's trial began in November 2019.[2] Bembeneck's defense at trial was that he did not see Rosinski stab anyone, and that he was merely present when Rosinski demanded money from Helen. Bembeneck testified that he took Brian's cell phone because he believed that it belonged to him. Bembeneck denied that he removed any other items from the home and claimed that he struck Francis and Brian with the flashlight because he saw them assault Rosinski. The jury convicted Bembeneck as described above. After Bembeneck was sentenced, the appeal in Docket No. 352561 followed.

Rosinski's trial began in January 2020. Rosinski testified that Bembeneck had abused her during the course of their relationship, that she had stopped taking medication for her mental health issues, and that Bembeneck had forced her to commit the robbery. Rosinski also testified that she did not intend to stab Francis and that she stabbed Richard because she was "scared" and because he was blocking her from leaving the home. The jury convicted Rosinski as described above. After Rosinski was sentenced, the appeal in Docket No. 352919 followed.

## II. COMMON ISSUE—ADMISSION OF RECORDINGS OF DEFENDANTS' JAILHOUSE CONVERSATIONS AT TRIAL

Both defendants argue that the trial court erred by denying their motions to suppress the recordings of their jailhouse conversations. We disagree.

### A. PRESERVATION AND STANDARDS OF REVIEW

"We review [preserved] issues of constitutional law de novo." *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011). Additionally,

[t]his Court reviews for clear error a trial court's factual findings in a ruling on a motion to suppress evidence. A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. The decision whether to admit evidence is within a trial court's discretion . . . . A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or

---

[2] While both defendants were charged at the same time, held in pretrial confinement at the same time, and had a joint preliminary exam, they were tried separately before two distinct petit juries at different times.

the application of a constitutional standard to uncontested facts, our review is de novo. [*People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019) (quotation marks and citations omitted).]

## B. RELEVANT AUTHORITY

"The Fourth Amendment of the United States Constitution and its counterpart in the Michigan Constitution guarantee the right of persons to be secure against unreasonable searches and seizures." *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000). The basic purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v United States*, ___ US ___, ___; 138 S Ct 2206, 2213; 201 L Ed 2d 507 (2018) (quotation marks and citation omitted). "[A] search for purposes of the Fourth Amendment occurs when the government intrudes on an individual's reasonable, or justifiable, expectation of privacy." *People v Mahdi*, 317 Mich App 446, 457-458; 894 NW2d 732 (2016) (quotation marks and citations omitted).

> Whether an expectation of privacy is reasonable depends on two questions. First, did the individual exhibit an actual, subjective expectation of privacy? Second, was the actual expectation one that society recognizes as reasonable? Whether the expectation exists, both subjectively and objectively, depends on the totality of the circumstances surrounding the intrusion. [*People v Antwine*, 293 Mich App 192, 195; 809 NW2d 439 (2011) (quotation marks and citations omitted).]

## C. ANALYSIS

Defendants were taken to the Leelanau County Jail after their arrests and were housed in "separate detox cells," which were all arranged in a single row. Defendants were placed in cells one and four, with cells two and three remaining vacant between them. Each cell had a built-in door, and the doors were used to pass food and other items to inmates. The sheriff's office colloquially referred to these doors as "bean chutes." When jail personnel noticed that defendants were communicating with each other by speaking loudly through their respective "bean chutes," they activated the cells' intercoms and recorded defendants' conversations. Defendants made incriminating statements during the conversations.

Defendants moved the trial court to suppress the recordings. The trial court denied both motions based on a determination that defendants did not have a subjective or reasonable expectation of privacy. We conclude that this was not in error. Defendants were housed in their own jail cells and were more than 20 feet away from each other. In order to communicate, defendants had to speak with elevated voices through their respective "bean chutes." Defendants' conversations could be heard by jail personnel who were outside their cells. Indeed, the cells were located "[d]irectly across from" the jail control room. Defendants acknowledged during one of their conversations that it appeared that one of the officers could hear their conversation. Specifically, during the January 11, 2019 conversation,[3] Rosinski asked Bembeneck, "Is that guy

---

[3] This was the first conversation that was recorded.

staring at you?"  Bembeneck responded, "Yep," and "[h]e's probably listening to what we're saying."  Bembeneck later reiterated this by stating, "You know what I'm wondering?  I'm wondering if they're listening to us right now while we're talking; I bet you they are. . . .  We can talk, but you got to remember to keep that in mind."  Thus, defendants were aware that others could hear their conversations.  Additionally, given the circumstances, it would be patently unreasonable for defendants to have an expectation of privacy.  Indeed, defendants were housed in a jail, were in the presence of jail personnel, and had been charged with several serious crimes.  Because defendants did not have subjective or reasonable expectations of privacy, the Fourth Amendment was not implicated.  See *Katz v United States*, 389 US 347, 361; 88 S Ct 507; 19 L Ed 2d 576 (1967) ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection.").  The trial court did not abuse its discretion by denying defendants' motions to suppress the recordings.  The fact that recording defendants' conversations was not necessary to accommodate the jail's "institutional needs and objectives" is immaterial.[4]

### III.  DOCKET NO. 352561 (DEFENDANT BEMBENECK)

### A.  PROSECUTORIAL ERROR

Bembeneck argues that he was denied a fair trial because the prosecutor improperly argued that Bembeneck "personally took items out of the house and into his car."  We disagree that Bembeneck is entitled to a new trial.

### 1.  PRESERVATION, STANDARD OF REVIEW, AND GENERAL PRINCIPLES OF LAW

Defense counsel did not object to the prosecutor's arguments and request a curative instruction, thereby rendering the issue unpreserved.  See *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008).  Unpreserved issues regarding prosecutorial error are reviewed "for outcome-determinative, plain error."  *Id*.  "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or

---

[4] We acknowledge that defendants rely on *People v Trudeau*, 385 Mich 276; 187 NW2d 890 (1971).  However, the validity of *Trudeau* is questionable.  Indeed, after *Trudeau* was decided, the United States Supreme Court ruled that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell."  *Hudson v Palmer*, 468 US 517, 526; 104 S Ct 3194; 82 L Ed 2d 393 (1984).  Importantly, "[i]t is beyond all question that the United States Supreme Court is the sole authoritative interpreter of the United States Constitution[.]"  *People v Gonzales*, 356 Mich 247, 262; 97 NW2d 16 (1959).  Regardless, even assuming that *Trudeau* is viable, it is distinguishable from the current case.  In *Trudeau*, the defendant presumably had a subjective expectation of privacy, such that the government could not enter his cell at any time and seize his personal effects, such as his shoes.  In this case, personal items were not seized from defendants, and defendants did not have an expectation of privacy in a conversation that spanned more than 20 feet of a jailhouse hallway where anyone nearby easily could overhear and record the conversation.  That aspect is fatal to any Fourth Amendment claim.  See *California v Ciraolo*, 476 US 207, 211; 106 S Ct 1809; 90 L Ed 2d 210 (1986) ("The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy[.]") (Quotation marks and citation omitted.)

obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error has affected a defendant's substantial rights when there is "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. Moreover, "once a defendant satisfies these three requirements, . . . [r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted; second alteration in original).

"A prosecutor has committed [error] if the prosecutor abandoned his or her responsibility to seek justice and, in doing so, denied the defendant a fair and impartial trial." *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014).

> A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence. Issues of prosecutorial [error] are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context. The propriety of a prosecutor's remarks depends on all the facts of the case. A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial. [*People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007) (quotation marks and citations omitted).]

"A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case." *Id*. at 66 (citations omitted).

## 2. ANALYSIS

During closing argument and rebuttal, the prosecutor noted multiple times that Bembeneck had taken items from the home and put them in the vehicle. Although Bembeneck argues that the evidence did not support that he had done so, Bembeneck ignores that he admitted in the recorded jail conversation that he had removed at least one item from the home. Specifically, Rosinski indicated that she had removed items from the closet, placed them on the bed, and instructed Bembeneck to take them outside. Bembeneck replied, "I took that thing outside." Additionally, Helen testified that she saw Bembeneck in possession of items from the closet. Testimony also supported that, after defendants left the bedroom, Rosinski went into the living room to demand money from Francis and that Bembeneck exited the home through the sliding door. Items that had previously been in the bedroom closet were located in the vehicle after defendants were arrested. Coins and a checkbook were located in Rosinski's purse, and the remaining items were found on the vehicle's floorboard, thereby supporting that Bembeneck took items to the motor vehicle. Therefore, the prosecutor's arguments that Bembeneck had carried items to the vehicle were

permissible because the evidence supported that inference. We conclude that defendant has failed to establish plain error.[5]

Additionally, because the prosecutor's arguments were proper, Bembeneck's argument that trial counsel was ineffective for failing to object must also fail. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## B. SUFFICIENCY OF THE EVIDENCE

Bembeneck argues that there was insufficient evidence to sustain his convictions. We disagree.

### 1. STANDARD OF REVIEW

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016) (quotation marks and citation omitted). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted).

### 2. RELEVANT AUTHORITY AND ANALYSIS

There is sufficient evidence for a guilty verdict where "a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010) (citation omitted). "Circumstantial evidence and the reasonable inferences that arise from that evidence can constitute satisfactory proof of the elements of the crime." *People v Blevins*, 314 Mich App 339, 357; 886 NW2d 456 (2016).

---

[5] Even if we concluded that the prosecutor's argument was improper, Bembeneck would not be entitled to relief. Indeed, the trial court instructed the members of the jury during the preliminary instructions that they were to base their verdicts "only on the evidence," which did not include the attorney's arguments. After closing arguments, the trial court issued the following standard instruction: "Remember that you have taken an oath to return a true and just verdict based only on the evidence and these instructions to you about the law." The trial court again instructed the jury what constitutes evidence and that the attorneys' arguments are not evidence. Accordingly, the members of the jury were instructed both at the beginning and the end of trial that they were to base their verdict on the evidence presented at trial. Because "[i]t is axiomatic that jurors are presumed to have followed their instructions," *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009), we conclude that Bembeneck cannot establish plain error affecting his substantial rights.

a. CONVICTIONS BASED ON BEMBENECK BEING THE PRINCIPAL OFFENDER

Bembeneck argues that the offenses for which he was convicted on the basis of being the principal were not supported by the evidence.

Bembeneck first challenges his conviction of larceny in a building and claims that the conviction cannot stand because there was no evidence that he personally took any items out of the home. This argument is wholly without merit. Brian testified that Bembeneck took his cell phone after Bembeneck struck Brian in the head with a flashlight. The phone was located in the vehicle after Bembeneck's arrest, and the jury was free to discredit Bembeneck's testimony that he thought that the phone belonged to him. Furthermore, the evidence, including Bembeneck's admission, establishes that he carried at least one item to the vehicle after removing it from the bedroom closet. Consequently, there is sufficient evidence to support Bembeneck's conviction of larceny in a building. See *People v Sykes*, 229 Mich App 254, 278; 582 NW2d 197 (1998) (outlining the elements of larceny from a building).

Bembeneck next argues that there was insufficient evidence to establish that he had the requisite intent to commit felonious assault as to Brian because he was defending Rosinski when he struck Brian with the flashlight. This argument is without merit.

> Once a defendant raises the issue of self-defense [or defense of others] and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense [or defense of others] exists, the prosecution must exclude the possibility of self-defense [or defense of others] beyond a reasonable doubt. [*People v Stevens*, 306 Mich App 620, 630; 858 NW2d 98 (2014).]

Although Bembeneck testified that he hit Brian because he saw Brian hit Rosinski in the face, the prosecution provided ample evidence to disprove Bembeneck's claim of defense of others. Brian testified that at the time he was struck, he had his cell phone out and had his head down because he was attempting to contact law enforcement. Furthermore, Brian was not armed with any sort of weapon when Bembeneck assaulted him. See *Stevens*, 306 Mich App at 630. The jury was able to view photographs of the wounds on Brian's head. To the extent that Bembeneck argues that the jury simply should not have believed the prosecutor's version of the events and should have concluded that he struck Brian to defend Rosinski, this Court resolves all conflicts of the evidence in favor of the prosecution when the sufficiency of the evidence is challenged. *People v Harrison*, 283 Mich App 374, 377-378; 768 NW2d 98 (2009). We also do not second-guess jury determinations regarding the weight of the evidence or the credibility of the witnesses. *Unger*, 278 Mich App at 222. Thus, we defer to the jury's determination that Bembeneck did not act in Rosinski's defense and conclude that the prosecutor presented sufficient evidence to support Bembeneck's conviction of felonious assault as to Brian.

b. CONVICTIONS BASED ON AIDING AND ABETTING THEORIES

Bembeneck was convicted of AWIGBH with respect to Richard, armed robbery with respect to Helen, felonious assault with respect to Francis, and assault with intent to rob while

armed with respect to Francis on aiding and abetting theories. Bembeneck argues that these convictions were not supported by the evidence.

"A person who aids or abets the commission of a crime may be convicted and punished as if he directly committed the offense." *People v Bosca*, 310 Mich App 1, 20-21; 871 NW2d 307 (2015) (quotation marks and citation omitted).

> To support a finding that a defendant aided and abetted a crime, the prosecution must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. [*People v Izarraras-Placante*, 246 Mich App 490, 495-496; 633 NW2d 18 (2001) (quotation marks and citation omitted).]

"In determining whether a defendant assisted in the commission of the crime[s], the amount of advice, aid, or encouragement is not material if it had the effect of inducing the commission of the crime. It must be determined on a case-by-case basis whether the defendant performed acts or gave encouragement that assisted" the commission of the crimes. *People v Moore*, 470 Mich 56, 71; 679 NW2d 41 (2004) (quotation marks and citations omitted).

"An aider and abettor's state of mind may be inferred from all the facts and circumstances." *Carines*, 460 Mich at 758 (quotation marks and citation omitted). Some of the factors that may be considered include the "close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Id.* (quotation marks and citation omitted). However, "evidence of a shared specific intent to commit the crime of an accomplice is [not] the exclusive way to establish liability[.]" *People v Robinson*, 475 Mich 1, 7; 715 NW2d 44 (2006). "A defendant is [also] criminally liable for . . . crimes that are the natural and probable consequences of the offense he intends to aid or abet." *Id.* at 15.

Bembeneck challenges the sufficiency of the evidence to support his conviction of assault with intent to rob while armed as to Francis. Bembeneck argues that the evidence fails to show that he knew that Rosinski intended to rob Francis or that he aided her in doing so. We disagree.

The evidence establishes that defendants entered Rosinski's grandparents' home without knocking, that Bembeneck did not introduce himself to anyone in the home, and that Bembeneck attempted to hide his face. Defendants, who were in a romantic relationship and who needed money to leave the state, grabbed Helen's arms and "marched" her into the bedroom. While in the bedroom, Bembeneck pushed Helen to the floor, and Rosinski demanded money. Defendants removed items from the closet and left the bedroom. Bembeneck then went outside, but left the sliding door open. Bembeneck's presence on the deck was noted by Francis and Brian. According to Francis and Brian, an individual who was standing on the deck would have been able to see and hear what was going on in the home.

While Bembeneck was outside, Rosinski repeatedly demanded money from Francis in a "very irate and loud" tone and indicated several times that she did not "want to hurt" Francis. After getting into a "very loud" argument with Brian in the kitchen, Rosinski pulled a knife from her

purse. Francis "hollered for her to . . . put the knife down," and Brian stated that he was going to call 911. Bembeneck reentered the home seconds later and hit Brian on the head with the flashlight. Then, while Francis was attempting to physically force Rosinski out of the home, Bembeneck hit Francis in the head with the flashlight. This resulted in Rosinski, who was still armed with the knife, being freed from Francis's grasp and being able to continue the robbery. Before leaving the home, Bembeneck took Brian's cell phone. Defendants then fled the scene and attempted to avoid being detained by law enforcement. Therefore, when viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to support Bembeneck's conviction of assault with intent to rob while armed.

Next, Bembeneck argues that there was insufficient evidence to support his conviction for felonious assault with respect to Francis because he did not have knowledge that Rosinski intended to stab Francis and did not aid her in doing so. As already stated, however, "evidence of a shared specific intent to commit the crime of an accomplice is [not] the exclusive way to establish liability[.]" *Robinson*, 475 Mich at 7. "A defendant is [also] criminally liable for . . . crimes that are the natural and probable consequences of the offense he intends to aid and abet." *Id*. at 15. Additionally, evidence supports that Bembeneck provided aid to Rosinski in order to further the attempted robbery of Francis. In doing so, Bembeneck struck Francis on the head with the flashlight, which resulted in Francis releasing his grip on Rosinski. As a result, Rosinski was able to use the knife to stab Francis. A natural and probable consequence of the crime of assault with intent to rob while armed is that the victim will be injured.

Although Bembeneck denies that he knew that Rosinski had a knife, Bembeneck admitted during one of the jail conversations that he saw the knife when he reentered the home. The record also supports that Bembeneck was able to see and hear what was taking place in the home. After a highly-agitated Rosinski pulled a large knife out of her purse, Francis "hollered for her to . . . put the knife down[.]" Additionally, Rosinski was holding the knife at her side when Bembeneck struck Francis in the head with the flashlight. A logical inference from this evidence is that Bembeneck was close enough to Rosinski to be able to see her wield the knife as a weapon and desired to help her keep control over it. Although Bembeneck testified that he hit Francis because he saw him assaulting Rosinski, the jury was free to disregard this version of events. Viewing the evidence in the light most favorable to the prosecutor and drawing all reasonable inferences in favor of the verdict, we conclude that there was sufficient evidence to convict Bembeneck of felonious assault with respect to Francis on an aiding and abetting theory.

Bembeneck next challenges the sufficiency of the evidence relating to his armed robbery conviction. In order to obtain a conviction for armed robbery, the prosecution had to prove

> (1) the defendant, in the course of committing a larceny . . . used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon. [*People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007).]

" '[I]n the course of committing a larceny' includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property." MCL 750.530(2). Larceny is "(a) a trespassory taking and (b) the carrying away (c) of the personal property (d) of another (e) with intent to steal that property." *People v March*, 499 Mich 389, 401; 886 NW2d 396 (2016).

In this case, defendants used force on Helen by grabbing her by the arms and "march[ing]" her to the bedroom, where they removed items from the closet. Bembeneck also pushed Helen to the ground. Although there is no evidence that either defendant possessed "a dangerous weapon" or purported to have a dangerous weapon while they were in the bedroom, Rosinski later produced the large kitchen knife from her purse. When Rosinski produced the knife, the larceny was not yet complete. Indeed, both defendants were still on the grandparents' property and at least one of the items from the closet was in the vehicle. See *id*.

Evidence also supports that Rosinski had her grandparents' checkbook in her purse at all relevant times. Specifically, Francis testified that he kept a checkbook in a desk. Brian saw Rosinski's purse in a chair "[r]ight next to the desk," and the checkbook was found in Rosinski's purse after she was arrested. Rosinski lived in her grandparents' home for two weeks in the fall of 2018, thereby giving her the opportunity to discover where her grandparents kept their checkbook. Importantly, Brian noted that Rosinski had previously taken "checks out of [the] checkbook." Given that Bembeneck had never been to the grandparents' home before January 10, 2019, the jury could have concluded that Rosinski placed the checkbook in her purse while she was in the home and that the larceny was therefore not complete until Rosinski left the home with her purse and the checkbook. Therefore, a rational jury could conclude that Rosinski possessed a dangerous weapon in the course of committing the larceny.

Contrary to Bembeneck's arguments on appeal, a rational jury could also conclude that Bembeneck aided and abetted Rosinski in the commission of armed robbery. Indeed, Bembeneck drove Rosinski to her grandparents' home, pushed Helen to the floor while in the bedroom, assisted Rosinski with removing items from the bedroom closet, and transported at least one item to the vehicle. Bembeneck also hit Brian with a flashlight so that he could not contact law enforcement, and hit Francis in the head with a flashlight when he was attempting to eject Rosinski from the home. As already discussed, a rational jury could conclude that Bembeneck was aware that Rosinski was in possession of a knife at all relevant times. Consequently, there was sufficient evidence to support Bembeneck's conviction of armed robbery as an aider or abettor.

Bembeneck next challenges the sufficiency of the evidence with respect to his AWIGBH conviction as to Richard. Bembeneck does not dispute that there was sufficient evidence to show that Rosinski committed the underlying offense. Indeed, the evidence showed that Rosinski stabbed Richard multiple times and almost punctured his lung.[6] See *Stevens*, 306 Mich App at 629

---

[6] The fact that the jury in Rosinski's trial failed to reach a verdict on the charge of assault with intent to commit murder as to Richard is irrelevant to Bembeneck's conviction for two reasons. First, unlike Bembeneck's jury, the Rosinski jury never considered the lesser included offense of AWIGBH with respect to Richard. Second, any verdict issued by the Rosinski jury is wholly

(stating that intent to cause serious harm can be inferred from the use of a dangerous weapon and that injuries suffered by a victim can be indicative of a defendant's intent). Instead, Bembeneck argues that there was insufficient evidence that he aided or abetted Rosinski in the commission of that crime. While we agree that there is nothing to show that Bembeneck specifically intended to aid Rosinski in stabbing Richard, that is not dispositive. An aider or abettor is liable for "the crime the defendant intends to aid or abet as well as the natural and probable consequences of that crime." *Robinson*, 475 Mich at 14-15.

In this case, there was evidence that Bembeneck struck Francis with the flashlight to help Rosinski escape his grasp while she was wielding a knife. As already stated, there was sufficient evidence to establish that Bembeneck knew that Rosinski had a knife. A rational jury could infer from this evidence that Bembeneck was aiding Rosinski's continued use of a knife to accomplish a larceny, and it is reasonable to conclude that a natural and probable consequence of a plan to commit larceny with a dangerous weapon is that someone could sustain great bodily harm. See *Stevens*, 306 Mich App at 628 (outlining the elements of AWIGBH). Accordingly, there was sufficient evidence to support Bembeneck's conviction of AWIGBH as to Richard as an aider or abettor.

## C. MRE 609—IMPEACHMENT VIA PRIOR CONVICTIONS

Finally, Bembeneck argues that the trial court improperly admitted evidence of his two prior convictions of receiving or concealing stolen property. Even if we were to conclude that the trial court abused its discretion by admitting the challenged evidence, the error would be harmless. See *People v Snyder (After Remand)*, 301 Mich App 99, 111-112; 835 NW2d 608 (2013) (holding that the admissibility of prior convictions is subject to harmless error analysis). Indeed, there was overwhelming evidence of Bembeneck's guilt, including Bembeneck's own admissions. Moreover, the mention of Bembeneck's prior convictions was brief, and Bembeneck was able to explain to the jury that he was convicted of those crimes as a result of his "failure to investigate" before he purchased property from a third party. Bembeneck also testified that "[i]t was two convictions out of the same [2013] transaction." Considering this evidence, we conclude that it is not more probable than not that admission of the evidence undermined the reliability of the verdict. See *id*.

---

immaterial to whether Bembeneck could be found liable under an aiding or abetting theory at his trial. See *People v Mann*, 395 Mich 472, 478; 236 NW2d 509 (1975) (stating that "a person may be prosecuted for aiding and abetting without regard to the conviction or acquittal of the principal").

## IV. DOCKET NO. 352919 (DEFENDANT ROSINSKI)

### A. SUFFICIENCY OF THE EVIDENCE

Rosinski argues that there was insufficient evidence to convict her of armed robbery because she did not threaten Helen with the knife in the bedroom.[7] However, as already discussed above, a rational jury could conclude that Rosinski committed armed robbery.[8] Although Rosinski argues on appeal that the evidence was insufficient because Rosinski did not produce the knife until after she left the bedroom and did not threaten Helen with the weapon, "a dangerous weapon" need only be produced "in the course of committing the larceny[.]" See *Chambers*, 277 Mich App at 7. As already discussed, the knife was produced before defendants left the home and during the time that Rosinski possessed at least one stolen item in her purse. See *March*, 499 Mich at 402 (noting that one of the elements of larceny is "the carrying away" of the stolen property). Additionally, there is no requirement that the weapon be possessed or used at the same time that force was used against the named victim. See MCL 750.529; MCL 750.530. Therefore, because the knife was produced "in the course of [Rosinski] committing the larceny," we conclude that sufficient evidence was presented to support the armed robbery conviction.

### B. ASSISTANCE OF COUNSEL

Rosinski argues that she was denied effective assistance of counsel when counsel failed to object to references to her past misdemeanor convictions. We disagree.

### 1. PRESERVATION, STANDARD OF REVIEW, AND GENERAL PRINCIPLES OF LAW

Rosinski failed to raise an ineffective assistance of counsel claim in the trial court in connection with a motion for a new trial or a motion to remand. Therefore, our "review is limited to mistakes apparent from the record." *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

To prevail on a claim of ineffective assistance of counsel, a defendant "must establish (1) the performance of his [or her] counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000). Effective assistance of counsel is strongly presumed. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012).

---

[7] The prosecution charged Rosinski with armed robbery, naming Helen as the person against whom force or violence was used.

[8] The evidence admitted at Rosinski's trial concerning the armed robbery was consistent with the evidence presented at Bembeneck's trial.

## 2. ANALYSIS

During Rosinski's testimony on direct examination, she testified that Bembeneck gave her instructions on how to commit the robbery. Rosinski noted that this was necessary because Bembeneck knew that she had "never necessarily even really been in legal trouble." Additionally, when attempting to explain incriminating statements that she made concerning her involvement in the crimes,[9] Rosinski noted that, unlike Bembeneck, she did not have a "criminal history." Based on her purported lack of "criminal history," Rosinski indicated that Bembeneck told her that she would only receive a "slap on the wrist" if she took responsibility for the crimes. The prosecutor sought to clarify this testimony on cross-examination in the following exchange:

> *Q.* So, when you said to the jury earlier that you don't have anything on your record that's not true. I'm not going to get into why you were in jail, but that's not true, is it?

> *A.* No, I do have two misdemeanors, two misdemeanor charges.[10]

> *Q.* But when you indicated earlier . . . to the jury that you didn't have a record that's not true, isn't it?

> *A.* I meant to say I don't really have much of a record compared to Justin Bembeneck. . . .

> *Q.* Okay. Well, I'm just relying on what you told the jury under oath and what you're saying now.

> *A.* Yeah.

Rosinski argues on appeal that her counsel was ineffective for failing to object to the prosecutor's questions because her previous convictions were not admissible under MRE 609. But that is not what happened here. The prosecution did not impeach Rosinski by introducing her specific criminal convictions as permitted under MRE 609. Indeed, the jury was only informed in general terms that Rosinski had been convicted of "two misdemeanors." Therefore, MRE 609 is inapplicable.

Instead, Rosinski's criminal history was properly used by the prosecution to challenge her credibility after she provided false testimony that she did not have a criminal history and had "never necessarily even really been in legal trouble." Thus, Rosinski's misleading testimony made her prior convictions relevant on cross-examination to evaluate her credibility as a witness. As

---

[9] When Rosinski was in jail awaiting trial, she made phone calls to a friend. Portions of the calls were played at trial. During the calls, Rosinski made several incriminating statements, including that she did not "give a s**t" about her family, that she had "robbed the f**k out of them," and that she had "tried to take them all out[.]"

[10] Rosinski was convicted of second-degree retail fraud and operating a motor vehicle while impaired.

stated in *People v Wilder*, 502 Mich 57, 66; 917 NW2d 276 (2018): "Absent a proper purpose, evidence of [a] defendant's other acts [is] inadmissible under MRE 404(a) unless [the] defendant opened the door by introducing evidence of his [or her] good character." Here, Rosinski testified that she had no criminal history, thereby implying that she was a law-abiding citizen. Because Rosinski "opened the door" with her testimony, we conclude that the prosecutor's questions were proper.

It should also be recognized that the introduction of this evidence did not run afoul of MRE 403, which precludes the admission of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. *People v Mardlin*, 487 Mich 609, 616; 790 NW2d 607 (2010). In this case, the evidence was more than marginally probative. Indeed, it directly related to Rosinski's credibility. It is also improbable that the jury gave the evidence undue or preemptive weight. Indeed, the jury only knew that Rosinski had been convicted of two misdemeanors. See *People v Ortiz*, 249 Mich App 297, 306; 642 NW2d 417 (2001) ("Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury.") (Quotation marks and citation omitted.) Moreover, the jury was instructed that it should not consider evidence of Rosinski's other acts for propensity purposes. "It is axiomatic that jurors are presumed to have followed their instructions." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009).

Because the prosecutor's questions were proper, Rosinski cannot show that trial counsel's performance fell below an objective level of reasonableness. See *Ericksen*, 288 Mich App at 201 ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").[11]

Affirmed in both dockets.

/s/ Thomas C. Cameron
/s/ Douglas B. Shapiro
/s/ James Robert Redford

---

[11] We note that Rosinski alleges in the statement of facts in her brief on appeal that some of the jury instructions were erroneous. However, Rosinski does not explain or rationalize her arguments or cite authority to support any argument concerning instructional error. Therefore, any instructional error argument is abandoned. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998). Rosinski's cursory arguments that counsel was ineffective for failing to investigate, for failing to obtain her medical records, and for failing to call an expert witness are also abandoned. See *id*.